UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

J. WALTER THOMPSON U.S.A., INC.,    :

               Plaintiff,    :

      - against -    :

BANK OF AMERICA CORPORATION,    :

             Defendant.    :

- - - - - - - - - - - - - - - - - -x        **MEMORANDUM DECISION**

BANK OF AMERICA, N.A.,    :        04 Civ. 1443 (DC)

      Third-Party Plaintiff, :

      - against -    :

THE FEDERAL RESERVE BANK OF    :
ATLANTA and FIRST BANKAMERICANO,
                   :
      Third-Party Defendants.
                   :
- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**   (see last page)

**CHIN, D.J.**

      Plaintiff J. Walter Thompson U.S.A., Inc. ("JWT"),
brings this action under Uniform Commercial Code ("UCC") §§ 4-103
& 4-401 and for negligence against defendant Bank of America,
N.A. ("BofA").  BofA, as third-party plaintiff, has asserted
claims against third-party defendants Federal Reserve Bank of
Atlanta ("FRB") and First BankAmericano ("FBA"), claiming that if
it is found liable to JWT, they are liable to BofA.  Before the
Court are JWT's motion for summary judgment against BofA and
BofA's motion for summary judgment against FRB and FBA.  For the

reasons set forth below, JWT's motion is granted and BofA's motion is granted in part and denied in part.

## STATEMENT OF THE CASE

### A.   The Facts

The facts are largely undisputed.  To the extent there is dispute, they are presented in the light most favorable to the non-moving parties.

JWT, an international advertising agency, has maintained a certain checking account at BofA since December 1999.  (Silberbauer Decl. ¶¶ 2-3).  On October 31, 2001, JWT issued check number 2011032 from that account, payable to the order of "OUTDOOR LIFE NTWK," in the amount of $382,210.15.  (Id. ¶ 17).  Somehow, the check was intercepted after it was mailed and the name of the payee was altered from "OUTDOOR LIFE NTWK" to "DIVERSIFIED BUSINESS ENTERPISES [sic] INC."  (Id. ¶¶ 20, 22). The altered check was then deposited into an account maintained by Diversified Business Enterprises at FBA.  (Id. ¶ 22).  FBA presented the altered check to the Federal Reserve Bank of New York, which, in turn, presented it to FRB, which, in turn, presented it for payment to BofA in College Park, Georgia. (Lindenauer Decl. ¶ 5; Neumann Decl. ¶ 6 & Ex. 7).  BofA paid the check in full and debited $382,210.15 from JWT's account. (Silberbauer Decl. ¶ 23).  The check was not endorsed with a signature; rather, on the back was written "For Deposit Only," along with the account number of Diversified Business Enterprises.  (Id. ¶ 24).

On January 2, 2002, the intended payee of the check, Outdoor Life Network, advised JWT that it had never received the check. (Id. ¶ 25). JWT notified BofA of the check alteration on the same day. (Id. Ex. C). BofA acknowledged the claim in a letter dated January 10, 2002. (Id. Ex. D). On March 12, 2002, JWT wrote another check for $382,210.15 to Outdoor Life Network, which was received and cashed by the latter as the intended payee. (Id. Ex. E). More than a year later, in a letter dated May 13, 2003, BofA informed JWT that it was denying its claim for reimbursement for the altered check, because "[FBA] has primary liability in this situation and this matter cannot be satisfactorily resolved without its active participation." (Id. Ex. F).

At all relevant times, JWT subscribed to BofA's "Positive Pay" program, which is designed to identify potentially fraudulent checks. (Silberbauer Decl. ¶ 13). Under this program, JWT provides BofA with a list identifying all JWT checks drawn on its account by date, check number, and amount, but not by payee name. (Id.). The program compares the information on the list with the date, check number, and dollar amount on checks presented for payment, and, if there is any discrepancy, BofA identifies the check as an exception, notifies JWT, and does not pay the check until it receives further instruction from JWT. (Id.).

In October 2003, various individuals were indicted by a grand jury in the District of New Jersey and charged with a

variety of crimes, including bank fraud, conspiracy to commit bank fraud, and conspiracy to engage in monetary transactions in property derived from unlawful activity in the United States. (Klausner Aff. Ex. E). Count seven of the superseding indictment alleges that "[o]n or about November 16, 2001, a member of the conspiracy deposited a stolen or altered check in the amount of $382,210.15 into a business account controlled by defendant JOHN GAROFALO at First Bank Americano in New Jersey." (Id.). Three defendants were found guilty of count seven. (Id. Ex. F). The parties do not seriously dispute that the check referenced in the superseding indictment is the check at issue in this case.

## B.   **Procedural History**

JWT commenced this action with the filing of a complaint on February 20, 2004. BofA answered on May 6, 2004, and filed a third-party complaint against FBA and FRB on June 28, 2004. FBA and FRB answered on August 4, 2004, and August 27, 2004, respectively.

After discovery, JWT moved for summary judgment against BofA on June 10, 2005, and BofA simultaneously moved for summary judgment against FRB and FBA. BofA does not oppose JWT's motion against it and instead states that if it is found liable to JWT, FBA and FRB should be held liable to BofA.

## DISCUSSION

## A.   **Subject Matter Jurisdiction**

JWT's complaint contains only state-law causes of

action, names "Bank of America Corporation" as the sole
defendant, and alleges the following: (1) JWT is a Delaware
corporation with a New York principal place of business (Compl. ¶
4); (2) Bank of America Corporation is a Delaware corporation
with a North Carolina principal place of business (id. ¶ 5); and
(3) this Court has jurisdiction based on 28 U.S.C. § 1332 because
there is complete diversity (id. ¶ 6). This was clearly an
error, as complete diversity does not exist when both plaintiff
and defendant are Delaware corporations. See 28 U.S.C. § 1332.

BofA's answer states that it was mistakenly sued as
"Bank of America Corporation" and that the true defendant is
"Bank of America, N.A." (Answer at 1).[1] The answer further
provides that "Bank of America, N.A., . . . is a national banking
association with a principal place of business in Charlotte,
North Carolina." (Id. ¶ 5). JWT has not disputed this
assertion. The question therefore arises as to where a "national
banking association" is a citizen for purposes of diversity-of-
citizenship jurisdiction.

By statute, "[a]ll national banking associations shall,
for the purposes of all other actions by or against them, be
deemed citizens of the States in which they are respectively

---

[1]    There is an entity called "Bank of America Corporation"
that is incorporated in Delaware.  See, e.g., http://www.sec.gov/
Archives/edgar/data/70858/000119312505039878/d10k.htm (Bank of
America Corporation Form 10-K for year ended December 31, 2004
(listing Delaware as state of incorporation)).  The parties have
proceeded, however, as if BofA has been substituted for Bank of
America Corporation.  (Answer ¶ 5).  The complaint is deemed
amended to that effect, as discussed below.

located." 28 U.S.C. § 1348. Prior to January 17, 2006, the general rule in this and other circuits was that national banks were "located" in, and therefore citizens of, every state in which they had a branch location or other substantial presence. See, e.g., Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 354 (S.D.N.Y. 1998) ("Under 28 U.S.C. § 1348, a national banking association is located in, and therefore a citizen of, every state in which it maintained branch banks."); Bank of New York v. Bank of America, 861 F. Supp. 225, 231 (S.D.N.Y. 1994) (same). Therefore, the Court would have lacked subject matter jurisdiction at the time the complaint was filed if BofA maintained even a single branch in Delaware.

On January 17, 2006, however, the Supreme Court rejected the notion that a national bank is a citizen of every state in which it maintains a branch, holding instead that "a national bank, for § 1348 purposes, is a citizen of the State in which its main office, as set forth in its articles of association, is located." Wachovia Bank v. Schmidt, 126 S. Ct. 941, 945 (2006). Therefore, because BofA's principal place of business is in North Carolina, complete diversity existed at the time of the filing of the complaint and the Court has subject matter jurisdiction.[2] Accordingly, I proceed to the merits.

_____

[2] No party has challenged jurisdiction, but objections to subject jurisdiction are not waivable. Hence, to the extent an argument could be made that the Court lacks subject matter jurisdiction due to the inadequate allegations of the complaint, the complaint is deemed amended to assert its claims against BofA rather than Bank of America Corporation. See 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon

## B.  The Merits

### 1.  Applicable Law

#### a.  JWT's Motion

JWT has moved for summary judgment against BofA, arguing that BofA is strictly liable to JWT because BofA paid a check from JWT's account that was not properly payable.

Under UCC § 4-401, "[a] bank may charge against the account of a customer an item that is properly payable from the account."  UCC § 4-401(a).[3]  An item is properly payable "if it is authorized by the customer and is in accordance with any agreement between the customer and the bank."  Id.  The comments to this section provide that "[a]n item containing a forged drawer's signature or forged indorsement is not properly payable."  Id. cmt. 1.  A bank that charges against its

---

terms, in the trial or appellate courts."); see also 6 Charles Alan Wright et al., Federal Practice & Procedure § 1474 (1990) ("A number of federal courts have relied on [Section 1653] to cure several different types of deficient statements of subject matter jurisdiction.").

[3]  The parties agree that the laws of New Jersey and Georgia apply to this case, as all of the relevant events occurred in those states.  New Jersey law applies to the events that occurred in New Jersey and Georgia law applies to the events that occurred in Georgia.  Both New Jersey and Georgia have adopted the 1990 revised Uniform Commercial Code.  See New Jersey Steel Corp. v. Warburton, 655 A.2d 1382, 1382 (N.J. 1995) (noting that New Jersey has adopted UCC Articles 3 and 4); Whiting-Turner/A.L. Johnson v. P.D.H. Dev., Inc., 184 F. Supp. 2d 1368, 1374 (M.D. Ga. 2000) (noting that Georgia has adopted UCC); see also, e.g., Ga. Code Ann. §§ 11-3-406, 11-4-208 & 11-4-401; N.J.Stat. Ann. §§ 12A:3-406, 4-208 & 4-401.  For reasons of convenience, all citations in this opinion are to the UCC.  The citations should be construed to the relevant Georgia and New Jersey statutes, as applicable.

customer's account an item that is not properly payable is, as a general matter, strictly liable to the customer.  See, e.g., Lor-Mar/Toto, Inc. v. 1st Constitution Bank, 871 A.2d 110, 115 (N.J. Super. Ct. App. Div. 2005) ("The bank's duty to charge its customer's account only for 'properly payable' items under [UCC § 4-401] imposes standards of strict liability.").

As with most any rule, however, there are exceptions. The only exception arguably applicable to this case is UCC § 3-406, which provides that "[a] person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument . . . is precluded from asserting the alteration . . . against a person who, in good faith, pays the instrument or takes it for value or collection."  UCC § 3-406(a).  The burden of proving failure to exercise ordinary care is on the party asserting the preclusion.  UCC § 3-406(c).

### b.  **BofA's Motion**

BofA has moved for summary judgment against FBA,[4] arguing that FBA breached presentment warranties under the UCC when it presented the check to BofA for payment, thereby making the representation that it had not been altered.

UCC § 4-208 provides, in pertinent part:

(a)  If an unaccepted draft is presented to the drawee for payment or acceptance and the drawee pays or accepts the draft, (i) the

---

[4]     BofA has moved against both FBA and FRB, but BofA represents -- and, from the tenor of its brief, FBA seems to agree -- that any liability would ultimately lie with FBA, as it was the bank that presented the check to BofA for payment.

person obtaining payment or acceptance, at
the time of presentment, and (ii) a previous
transferor of the draft, at the time of
transfer, warrant to the drawee that pays or
accepts the draft in good faith that . . .
the draft has not been altered.

(b)  A drawee making payment may recover from
a warrantor damages for breach of warranty
equal to the amount paid by the drawee less
the amount the drawee received or is entitled
to receive from the drawer because of the
payment.  In addition, the drawee is entitled
to compensation for expenses and loss of
interest resulting from the breach.  The
right of the drawee to recover damages under
this subsection is not affected by any
failure of the drawee to exercise ordinary
care in making payment. . . .

(c)  If a drawee asserts a claim for breach
of warranty under subsection (a) based on an
unauthorized indorsement of the draft or an
alteration of the draft, the warrantor may
defend by proving that the indorsement is
effective under Section 3-404 or 3-405 or the
drawer is preluded under Section 3-406 or 4-
406 from asserting against the drawee the
unauthorized indorsement or alteration.

UCC § 4-208.  As a general matter, "[t]hrough presentment

warranties, the general scheme of the U.C.C. shifts losses up the

collection stream to presenting and depository banks." Wachovia

Bank, N.A. v. Fed. Reserve Bank of Richmond, 338 F.3d 318, 321

(4th Cir. 2003).  Thus, under Section 4-208(a), a bank that

presents a check for payment warrants, at the time of

presentment, that the check has not been altered.  Under Section

4-208(b), a paying bank that pays the draft in good faith may

recover damages against the presenting bank for breach of the

presentment warranty.  UCC § 4-208(b).  The UCC defines "good

faith" as "honesty in fact and the observance of reasonable

commercial standards in fair dealing."  UCC § 3-103.[5]

Section 4-208(c) provides that a presenting bank may defend against a drawee's claim for breach of warranty by proving, among other things, that the drawer is precluded under Section 3-406 from asserting the alteration against the drawee. In other words, if a drawee (here, BofA) asserts a claim for breach of a presentment warranty against a presenting bank (here, FBA), the presenting bank (FBA) may defend against the drawee's (BofA's) claim by proving that the drawer's (here, JWT's) "failure to exercise ordinary care substantially contribute[d] to [the] alteration."  UCC § 3-406.

## 2.  **Application**

### a.  **JWT's Motion**

As noted, BofA does not oppose JWT's motion for summary judgment against it.  Instead, the parties agree that FBA has a statutory right under the UCC to assert defenses to JWT's motion on BofA's behalf.  For purposes of this decision, the Court assumes without deciding that FBA has that right.[6]

---

[5]     UCC Section 4-104 provides that the definition of "good faith" in Section 3-103 applies to Article 4 as well.  UCC § 4-104(c).

[6]     Both BofA and FBA assert that FBA's "statutory right" to oppose JWT's motion on BofA's behalf arises from UCC § 4-208, which provides:

> If a drawee asserts a claim for breach of
> warranty under subsection (a) based on an
> unauthorized indorsement of the draft or an
> alteration of the draft, the warrantor may
> defend by proving that the indorsement is
> effective under Section 3-404 or 3-405 or the

FBA opposes JWT's motion on the grounds that questions of fact exist as to whether JWT (the drawer) is precluded from asserting the alteration against BofA under UCC § 3-406. The issue for the Court therefore is whether questions of fact exist as to whether JWT's "failure to exercise ordinary care substantially contribute[d] to [the] alteration."

FBA points to approximately ten other instances of check fraud or attempted check fraud relating to checks issued from the JWT checking account in question. In one such case similar to this one, JWT wrote a check for $50,180.50 to "Castorri and Company," and the payee name was altered to read "Vintage Mutual Fund." (Sessa Decl. ¶ 8). JWT never suffered a loss as a result of this altered check, because BofA credited its account for the full amount of the check. (Id.; Klausner Reply Affirmation Ex. B). In another case, a JWT check that was originally made payable to "Texas Fish & Game" in the amount of

---

        drawer is precluded under Section 3-406 or 4-
        406 from asserting against the drawee the
        unauthorized indorsement or alteration.

UCC § 4-208(c). The Court is not convinced that either this section or any of the authorities cited to the Court establish that Section 4-208 provides FBA with such a statutory right. The section, by its plain terms, grants a presenting bank a defense when a "drawer asserts a claim for breach of warranty" against it. Id. (emphasis added). In other words, it grants FBA the right to defend against BofA's motion for summary judgment on its beach of warranty claim under Section 4-208 by proving that JWT's negligence substantially contributed to the alteration. It does not logically follow that FBA is therefore entitled to defend on BofA's behalf JWT's motion for summary judgment on its Section 4-401 claim against BofA. Nonetheless, the Court assumes that FBA has the right to defend against JWT's motion, as ultimately it makes no difference because summary judgment is appropriate whether or not FBA is permitted to interpose a defense.

$7,376.21 was altered to be made payable to "Industrial Energy Inc." in the amount of $495,000.00. (Wallach Affirmation Exs. 2-3). JWT did not suffer a loss as a result of this check because it was discovered by BofA's Positive Pay system (because the amount of $495,000.00 did not match the amount of $7,376.21 that had been authorized as properly payable) and it was never deducted from JWT's account. (<u>See</u> Magee Reply Decl. ¶ 8). Of the remaining instances, it appears that JWT may have suffered losses totaling $8,614.75[7] as a result of four fraudulent checks (not counting the $382,210.15 at issue in this case). (Sessa Decl. ¶¶ 6, 9).

FBA argues JWT's awareness of these prior instances of check fraud "should have caused JWT to close its checking account with BofA and prevent this loss." (Third-Party Defendants' Memorandum of Law in Opposition to Motions for Summary Judgment ("FBA Br.") at 6). According to FBA, a reasonable jury could find that JWT's failure to close its checking account "substantially contributed" to the alteration of the check at issue here. (<u>Id.</u> at 6-10). Similarly, FBA argues that JWT, to supplement BofA's Positive Pay program, should have provided BofA with more detailed information regarding all legitimate checks that it issued, including the proper payee names. (<u>Id.</u> at 8).[8]

___

[7] The Court arrived at this number by adding up the total of the checks referenced in paragraphs six and nine of the Declaration of Anthony Sessa.

[8] As noted above, as part of Positive Pay, JWT provided BofA with the numbers, dates, and amounts of all legitimate checks, but not payee names. (Silberbauer Decl. ¶ 13).

The Court is not persuaded. First, as JWT points out, over the course of two years it suffered a loss of only a few thousand dollars on a handful of checks out of more than 45,000 checks issued from the account. (Silberbauer Decl. ¶ 15). Second, and more important, there is nothing in the record to suggest that the mere act of keeping the account open "substantially contributed" to the alteration. Put another way, there is no evidence that closing the account would have prevented the alteration and that a new account would have been safe from the thievery. It is undisputed that the payee name was altered after the check was mailed; as a matter of logic, it would make no difference to the thief who altered the check whether the check was drawn on the account in question or some other hypothetical account. Third, no reasonable jury could find that JWT's failure to provide payee names to BofA as part of the Positive Pay program "substantially contributed" to the alteration. To the contrary, if anything, JWT's check fraud history demonstrates that the Positive Pay program was working as designed -- it identified more than $1.2 million in fraudulent checks and prevented that amount from being deducted from JWT's account.

Next, FBA argues that summary judgment is inappropriate because the superseding indictment that references the check states that "the defendants and other individuals devised and carried out a scheme to obtain the proceeds of stolen checks by altering the payee names." (FBA Br. at 9). FBA argues that

despite the convictions of individuals who undisputedly were not affiliated with JWT, it is still not known "how the checks were obtained or by whom, [or] . . . if someone from JWT stole the checks or played any role in the check scheme."  (Id.).

Bare speculation that some unknown individual might have played some unspecified role in the fraud is insufficient to defeat summary judgment.  The UCC places the burden of proving JWT's failure to exercise ordinary care squarely on FBA.  See UCC § 3-406(c) ("[T]he burden of proving failure to exercise ordinary care is on the person asserting the preclusion.").  To satisfy this burden and defeat summary judgment, FBA is obligated to present some evidence; mere conjecture that a JWT employee might have participated in the criminal conspiracy is not enough.  See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 85 (2d Cir. 2005) ("[C]onclusory statements, conjecture, or speculation are inadequate to defeat a motion for summary judgment.") (citations omitted).

Accordingly, JWT's motion for summary judgment against BofA is granted.

**b.    BofA's Motion**

In addition to arguing that BofA's motion should be denied because JWT's negligence substantially contributed to the alteration, FBA argues that BofA should be precluded from recovering against FBA because there is evidence from which a reasonable jury could conclude that BofA did not act in good faith when it made payment on the altered check.  (FBA Br. at

11).  Specifically, FBA argues that the record suggests that BofA's Positive Pay program might have been able to deter fraud by reviewing payee names in addition to the date, check number, and amount, and that BofA's failure to utilize that ability on JWT's account somehow constituted bad faith.  FBA also argues that JWT's check fraud history, described above, gave BofA "actual knowledge" that there "was a problem with the security of checks on JWT's account at [BofA]."  (FBA Br. at 12).

These arguments are rejected.  As noted above, "good faith" is defined as "honesty in fact and the observance of reasonable commercial standards in fair dealing."  UCC § 3-103.  Even accepting FBA's arguments as true, at most they suggest negligence on BofA's part, not lack of good faith.  Section 4-208 makes clear that "[t]he right of the drawee to recover damages under this subsection is not affected by any failure of the drawee to exercise ordinary care in making payment."  UCC § 4-208(b).  As explained by the court in Wachovia:

> This distinction [between negligence and bad faith] is critical.  In order to survive summary judgment, the FRB must point to evidence in the record indicating that Wachovia acted in an unfair or dishonest manner, rather than in a negligent manner.  Because the FRB has not demonstrated that a question of material fact exists as to Wachovia's honesty or fair dealing, the FRB cannot prevail on its defense that Wachovia lacked good faith in paying the check.

338 F.3d at 323.

Accordingly, summary judgment is granted for BofA on its motion against FRB and FBA for recovery on its claim of

breach of presentment warranty under UCC § 4-208.

## C.    **Attorneys' Fees**

BofA argues that it is entitled to attorneys' fees from
FRB under Section 4-208(b), which provides, in part, that "the
drawee is entitled to compensation for expenses and loss of
interest resulting from the breach."  UCC § 4-208(b).  The issue
is whether the UCC provides for recovery of attorneys' fees as
part of "expenses" incurred in litigating a cause of action under
Section 4-208 for breach of a presentment warranty.

Two sections of the UCC are relevant to the resolution
of this issue.  First, the comments to UCC Section 3-417[9]
contemplate that attorneys' fees may be recoverable in some
circumstances.  See UCC § 3-417 cmt. 5 ("There is no express
provision for attorney's fees, but attorney's fees are not meant
to be necessarily excluded.  They could be granted because they
fit within the language 'expenses . . . resulting from the
breach.'").  Second, as a general matter, the UCC provides that
the liability of a bank for breach of a presentment warranty is
to be governed by the law of the state in which the bank is
located.  See UCC § 4-102(b) ("The liability of a bank for action
or non-action with respect to an item handled by it for purposes
of presentment, payment or collection is governed by the law of
the place where the bank is located.").  FRB is located in

---

[9]    The comments to Section 4-208 provide that "[t]his
section conforms to Section 3-417 and extends its coverage to
items.  The substance of this section is discussed in the Comment
to Section 3-417."  UCC § 4-208 cmt. 1.

Georgia.[10]

BofA relies primarily upon <u>Alterman Foods, Inc. v.</u>
<u>G.C.C. Beverages, Inc.</u>, 310 S.E.2d 755 (Ga. Ct. App. 1983).
There, the plaintiff was a supermarket customer who sued the
supermarket and its soft-drink supplier for personal injury when
a box of soft drinks she had purchased from the supermarket
ruptured, causing a bottle to fall and break her big toe.  310
S.E.2d at 756.  The supermarket, in turn, asserted a cross-claim
for indemnification against the soft-drink supplier, arguing that
the supplier had breached the implied warranty of merchantability
and fitness for a particular purpose when it supplied the
supermarket with defective boxes.  <u>Id.</u> at 757.  Ruling on the
supermarket's claim for attorneys' fees, the court held that
attorneys' fees are recoverable, as an exception to the general
rule, in cases against third parties involving a breach of an
implied warranty.  <u>Id.</u>

<u>Alterman</u> cites approvingly <u>Perkins State Bank v.</u>
<u>Connolly</u>, 632 F.2d 1306 (5th Cir. 1980), which held that
attorneys' fees are recoverable under UCC Section 4-207.  The
Fifth Circuit, applying Florida law, explained that Section 4-207
was likely not "explicit enough to allow for awards of attorney's
fees to a prevailing party as part of its costs.  But fees are

---

        [10]     BofA seeks attorneys' fees only from FRB.  It concedes
that it cannot recover attorneys' fees from FBA, because FBA is
located in New Jersey and New Jersey law does not provide for
recovery of attorneys' fees in cases such as this one.  (<u>See</u>
BofA's Memorandum of Law in Support of its Motion for Summary
Judgment Against Third-Party Defendants ("BofA Br.") at 19-20).

sought by [the plaintiff] as part of the damages in its indemnity counterclaim. Therefore the general rule strictly construing statutory awards of attorney's fees does not seem applicable." Id. at 1315-16.

From these two decisions, the Court gleans that Georgia law allows for recovery of attorneys' fees when the fees are sought as part of damages on a party's indemnity claim, but not when a prevailing party seeks fees merely as part of its costs. BofA arguably would be entitled to an award of attorneys' fees, then, if it had asserted a claim for indemnification against FRB in its third-party complaint. The problem, which neither party seems to have noticed, is that it did not.

BofA's third-party complaint asserts three claims. The first claim is against both FBA and FRB and seeks to hold them liable for any amount that BofA is held liable to JWT -- in other words, the amount of the check. The second claim is against FRB and also seeks to hold it liable for whatever amount BofA is held liable to JWT. The third cause of action is asserted against FBA only, and references "various costs and expenses, including, but not limited to, legal fees in defending this action." (BofA Third-Party Compl. ¶ 15). It states that "third-party defendant FBA should be held and adjudged liable to Bank of America for all of the costs, and expenses, including, but not limited to, legal fees and loss of interest, resulting from the breach of its aforesaid warranty." (Id. ¶ 16) (emphasis added). As BofA concedes that it cannot recover attorneys' fees against FBA under

New Jersey law, and it did not assert a claim for fees against FRB, it is not entitled to attorneys' fees.  The Court cannot grant summary judgment on a claim that was not asserted in the third-party complaint.

## D.   **Sanctions**

Finally, BofA seeks recovery of its attorneys' fees from FBA as a sanction for FBA's counsel's alleged failure to respond to BofA's document requests in a timely fashion.

### 1.   **Facts**

At a conference on October 29, 2004, the Court set April 1, 2005, as the discovery cut-off.  BofA served FBA with a document request on February 3, 2005.  (Neumann Decl. ¶ 26 & Ex. 9).  On February 4, 2005, FBA's counsel, William D. Wallach, Esq., wrote to BofA's counsel, Ronald M. Neumann, Esq., and indicated that FBA would not be responding to the document request because it was "out of time."  (Id. ¶ 27 & Ex. 10).  On February 10, 2005, Wallach apparently realized that he was mistaken, and indicated in a letter to Neumann that "there should be no issue with respect to [the] discovery request."  (Id. Ex. 13).  Wallach also represented that FBA was "now in a position to accept the tender of defense," presumably meaning that FBA was going to assume BofA's defense of the JWT complaint.  (Id.).  On February 14, 2005, Neumann wrote to Wallach to memorialize their conversation of the same day in which Wallach represented that FBA would comply with BofA's document request.  (Id. Ex. 12).  On March 23, 2005, Wallach wrote to the Court to request an

adjournment of a pre-trial conference that had been scheduled for April 1, 2005. (Id. Ex. 15). Wallach bcc'd Neumann, and indicated in the bcc copy only that FBA had accepted BofA's defense. (Id.).

Despite Wallach's assurances that FBA would comply with the discovery request and assume BofA's defense, as of April 1, 2005, FBA had not provided BofA with a single document, nor had it executed an indemnity agreement by which it would have assumed BofA's defense. (Id. ¶ 35). On April 5, 2005, Wallach reversed course on his previous assurances that FBA would assume (and, indeed, had assumed) BofA's defense, and informed Neumann in a letter that FBA would not be assuming BofA's defense because BofA had allegedly failed to disclose the existence of the $495,000.00 check (described above). (Id. Ex. 17). Wallach also represented that he would provide a response to BofA's discovery request prior to April 15, 2005, which was the date to which the Court had adjourned the conference previously scheduled for April 1, 2005. (Id.). Finally, on May 13, 2005, FBA provided thirty-six pages of documents, which BofA argues were largely nonresponsive to its request. (Id. ¶¶ 36-37).

    2.    **Applicable Law**

As the Second Circuit has explained, a district court "has inherent power to sanction parties and their attorneys, a power born of the practical necessity that courts be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." <u>Revson v. Cinque & Cinque</u>,

P.C., 221 F.3d 71, 78 (2d Cir. 2000) (quotation omitted).  The
power may be exercised where the party or attorney has acted "in
bad faith, vexatiously, wantonly, or for oppressive reasons."
Id. (quotation omitted).  An award of sanctions under the court's
inherent powers "requires both clear evidence that the challenged
actions are entirely without color, and [are taken] for reasons
of harassment or delay or for other improper purposes[,] and a
high degree of specificity in the factual findings of [the] lower
courts."  Id. (citations omitted) (alterations and emphasis in
original).  The trial court must find clear evidence that "(1)
the offending party's claims were entirely meritless and (2) the
party acted for improper purposes."  Id. at 79 (citation
omitted).

      **3.   Application**

      Applying these standards, Wallach's actions do not rise
to the level of sanctionable conduct.  Although his failure to
comply with the Court-imposed discovery deadline is certainly
troubling, there is no evidence in the record that he acted for
improper purposes.  Furthermore, the arguments that Wallach
asserted on FBA's behalf were not "completely without merit."
FBA's defenses to liability -- JWT's alleged negligence and
BofA's alleged bad faith -- though rejected, were not so
frivolous as to have been "entirely meritless."  BofA's request
for sanctions is therefore denied.

## CONCLUSION

For the foregoing reasons, summary judgment is granted for JWT on its claim against BofA under UCC § 4-401. Summary judgment is also granted for BofA on its claim under UCC § 2-208 against FRB and FBA, and thus FRB and FBA are liable to BofA to the same extent BofA is liable to JWT.[11] BofA's request for sanctions and attorneys' fees is denied.

The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

Dated:    New York, New York
          March 1, 2006

DENNY CHIN
United States District Judge

---

[11]    BofA is entitled to summary judgment against both FRB and FBA under UCC § 4-208 for their breach of the presentment warranty, because that section provides that both presenting banks and previous transferors warrant at the time of presentment that the check has not been altered. BofA represents that "because [FRB] is entitled to recover from FBA (pursuant to FBA's transfer warranty), the ultimate liability for payment of the JWT Check will be FBA's." (BofA Br. at 7). Indeed, this appears to be the case, as the UCC shifts liability up the stream to FBA, the first presenter. BofA, however, is entitled to recover the amount of the check jointly and severally from both of them, and no cross-claims between FBA and FRB are before the Court.

-22-

**APPEARANCES**

DAVIS & GILBERT LLP
Attorneys for Plaintiff
    By:  Jennifer Tafet Klausner, Esq.
         Ina B. Scher, Esq.
1740 Broadway
New York, NY   10019

ZEICHNER ELLMAN & KRAUSE
Attorneys for Defendant/Third-Party Plaintiff
    By:  David B. Chenkin, Esq.
         Ronald M. Neumann, Esq.
575 Lexington Avenue
New York, NY   10022

McCARTER & ENGLISH, LLP
Attorneys for Third-Party Defendants
    By:  William D. Wallach, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ   07102